UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

GENWORTH LIFE INSURANCE COMPANY OF
NEW YORK,

                Plaintiff,

    -vs-

GARY S. DWAILEEBE, DAVID J.
DWAILEEBE, LINDA A. VAN NESS, MARK
C. DWAILEEBE, JENNY S. TRAPANI,
JAMES A. DWAILEEBE, GEORGE N.
DWAILEEBE, LAURIE J. OVERMEYER,
MICHELE M. AZZI, MICHAEL G.
DWAILEEBE, THE ESTATE OF GERALDINE
H. DWAILEEBE, GEORGE N. DWAILEEBE,
in his capacity as an Executor of
the Estate of Geraldine H.
Dwaileebe; and MICHAEL G.
DWAILEEBE, in his capacity as an
Executor of the Estate of Geraldine
H. Dwaileebe,

                Defendants.

**DECISION and ORDER**
**No. 6:12-cv-06330-MAT**

---

## INTRODUCTION

Genworth Life Insurance Company of New York ("Plaintiff" or "Genworth") brings this interpleader action under 28 U.S.C. § 1335, seeking, among other forms of relief, discharge from all liability in connection with two annuities it issued to Geraldine H. Dwaileebe ("the Annuitant"), who is now deceased.

### FACTUAL BACKGROUND

**I.   The Annuities and the Purported Beneficiary Change**

On August 9, 2011, and August 15, 2011, Genworth issued two Individual Single Premium Deferred Annuity Contracts (#431641842

and #431409864, respectively) (collectively, "the Annuities") to the Annuitant. At the time, the Annuitant's youngest son, David J. Dwaileebe ("David" or "the Disclaiming Beneficiary"), was the designated beneficiary for 100% of the benefits payable under the Annuities upon her death ("the Death Benefit"). By means of a New York Statutory Short Form Power of Attorney dated March 24, 2011 ("the 3/24/11 POA"), the Annuitant designated her son, George N. Dwaileebe ("George"), as her attorney-in-fact. George then submitted Annuity Contract Change Forms, dated January 4, 2012, which purported to reduce David's interest in the Death Benefits from 100% to 30.25%, and to disburse 69.75% of David's interest in the Death Benefit among the remaining siblings, with each of them to receive 7.75%. By letter dated January 18, 2012, Genworth informed the Annuitant that the 3/24/11 POA did not grant George the authority to make beneficiary changes for the Annuities, and that the beneficiary changes set forth on the January 4, 2012 Annuity Contract Change Forms ("the Change Forms") therefore could not be effectuated.

The Annuitant passed away on January 23, 2012. Upon her death, a Death Benefit in the amount of $237,986.04 (for Annuity #431641842), and a Death Benefit in the amount of $222,037.47 (for Annuity #431409864) became payable.

By letter dated January 25, 2012, Daniel G. Schum, Esq. ("Attorney Schum"), who represented the Estate of the Annuitant

("the Estate"), provided Genworth with a copy of a New York Short Form Power of Attorney, dated January 11, 2012, designating George as the Annuitant's attorney-in-fact ("the 1/11/12 POA"). In contrast to the 3/24/11 POA, the 1/11/12 POA included a Statutory Gifts Rider, which authorized the designated attorney-in-fact "to add, remove or otherwise change the named beneficiary(ies) of any contract of life . . . insurance or any combination of insurance procured by or on behalf of the principal prior to or after the creation of the agency." However, as Genworth informed Attorney Schum by letter dated February 7, 2012, because the Change Forms were signed *prior* to execution of the 1/11/12 POA with the Statutory Gifts Rider, the change-of-beneficiary designations could not be effectuated. Genworth, in an attempt to resolve the competing claims, suggested to the Estate, that if David were willing to sign a Disclaimer and Release, the Death Benefit under the Annuities could be distributed in accordance with the Change Forms. Genworth subsequently received a Disclaimer and Release ("the Disclaimer"),[1] signed by David and dated March 2, 2012.

Genworth received claim forms for the Annuities' Death Benefit from certain of David's siblings, namely, Linda A. Van Ness, Jenny

---

[1]

The Disclaimer provides, in relevant part, as follows: "The undersigned, David J. Dwaileebe, hereby irrevocably and unqualifiedly renounces and disclaims 69.75% of his right, title and interest in and to the following described property: Annuity Contract numbers 431409864 and 431641842, with Annuitant/Owner as Geraldine H. Dwaileebe, issued by Genworth Life Insurance Company of New York." (Complaint ("Compl.") (Dkt #1), ¶ 30).

S. Trapani, James A. Dwaileebe, George (individually), Laurie J. Overmeyer, Gary S. Dwaileebe, Michelle M. Azzi, and Michael G. Dwaileebe (individually). By Deferred Annuity Claim Form dated April 2, 2012, David also made a claim for the Death Benefit.

In a letter to Genworth dated April 5, 2012, Mark C. Dwaileebe ("Mark" or "the Contesting Beneficiary"), disputed David's capacity to execute the Disclaimer.[2] The Contesting Beneficiary's letter stated, in pertinent part, as follows:

> [P]lease be advised that David [the Disclaiming Beneficiary] signed over his shares without fully understanding what he was doing. It is and always has been that David was to be provided for in the event of both our parent's [sic] deaths. David does not have the ability to understand nor comprehend what he was signing over. He is 47 years of age and has always lived at home with both our parents because he has always needed guidance due to an illness at birth.
>
> On or about January 16th 2012 my mother who was dying of cancer was coerced into changing her power of attorney so that the benefactor would be changed. This is not what she ever intended for 30 plus years.

(Compl. ¶ 33). In light of the adverse and conflicting demands for payment of the Death Benefit, and Genworth's inability to determine whether David was competent to execute the Disclaimer, Genworth commenced the instant interpleader action on June 19, 2012.

---

[2]

Notwithstanding the fact that the Change Forms purported to give 7.75% of the Death Benefit to Mark, Genworth has never received a claim form from him. (Compl. ¶ 34).

## II.  **The Federal Interpleader Action**

On September 11, 2012, an answer to Genworth's complaint was filed by six of David's siblings: Linda A. Van Ness; Jenny S. Trapani; James A. Dwaileebe; Laurie J. Overmyer; George, individually and as an executor of the Estate; and Michael G. Dwaileebe, individually and as an executor of the Estate (collectively, "the Objectants"). The Objectants' answer also was purportedly filed on behalf of David. On April 1, 2013, the Objectants filed a motion to settle this case consistent with the terms of the purported Disclaimer.

On June 7, 2013, Mark filed his pro se answer, alleging, among other things, that David was "not aware of the documents presented to him to sign on or about March 2, 2012 [i.e. the Disclaimer] and April 2, 2012, and furthermore does not have the mental capacity to understand what he was signing away." (Answer of Mark C. Dwaileebe (Dkt #3), ¶ 3). On June 17, 2013, Gary S. Dwaileebe filed his pro se answer, requesting that this Court order a comprehensive psychological evaluation of David and further order that David receive 100% of the Annuities' Death Benefit. (Answer of Gary S. Dwaileebe (Dkt #38) at 5).

On June 17, 2013, Brian Laudadio, Esq. ("Attorney Laudadio") was substituted as David's counsel of record and, on June 19, 2013, he moved to stay (Dkt #39) this action pending the adjudication of a petition pursuant to New York Mental Hygiene Law ("M.H.L.")

Article 81 ("the Article 81 Proceeding") in the Monroe County Surrogate's Court ("Surrogate's Court"). On June 19, 2013, this Court entered an order (Dkt #41) denying the Objectants' motion to approve the proposed settlement and staying the action in its entirety pending the resolution of the Article 81 Proceeding in Surrogate's Court.

## III. The Surrogate's Court Proceedings

By means of an Article 81 petition filed on June 17, 2013, David's sister, Michele M. Azzi ("Azzi"), sought a finding that David was likely to suffer harm because he lacked the capacity to manage his financial affairs. Azzi requested that she be appointed as the guardian of his property. The co-defendants in the federal interpleader action all were named in the Article 81 proceeding as interested parties.

On August 15, 2013, Andrew R. Randisi, Esq., counsel for the Objectants, filed a response to the Article 81 petition asserting that David did not require appointment of a guardian. On April 8, 2014, one of the Objectants, Jenny S. Trapani ("Trapani"), filed a pro se cross-petition in Surrogate's Court alleging that while he required some assistance with financial and other personal matters, David did not require the appointment of a guardian. Trapani alternatively requested that if David were found to require a guardian, that Azzi should not be appointed to serve in that capacity. On April 17, 2014, Azzi moved to dismiss the

cross-petition. The Honorable Edmund A. Calvaruso ("Surrogate Calvaruso") granted Azzi's motion to dismiss the cross-petition on August 18, 2014.

On November 20, 2014, a hearing was held before the Surrogate Calvaruso, without notice to the Objectants. (See Transcript of Hearing (Dkt #59-7, pp. 23-35 of 35)). At that time, Surrogate Calvaruso accepted into evidence, inter alia, a Psychological Evaluation, prepared by Tricia L. Peterson, Ph.D., ABPP, following her examination and testing of David (Dkt #59-5; also Dkt #59-13); and the report of the independent court-appointed evaluator, Loren H. Kroll, Esq., dated November 12, 2014 (Dkt #59-6). At the conclusion of the hearing, Surrogate Calvaruso determined, among other things, that it was necessary to appoint a guardian for David because he "is not able to provide for his property management, is incapacitated as that term is defined in § 81.02 of the Mental Hygiene Law, and is at risk of suffering harm due to his functional limitations and inability to adequately understand and appreciate the nature and consequences of the limitation." (Order and Judgment Appointment Guardian of the Property (Dkt #59-7, pp. 3-4 of 35)). Consequently, Azzi was appointed to serve as the guardian of David's property. Surrogate Calvaruso further determined that David suffered from the same functional limitations on March 2, 2012, and sua sponte, declared the purported Disclaimer and Release signed by

David on March 2, 2012 revoked, null, void, invalid and without legal effect, pursuant to N.Y. M.H.L. § 81.29. (Id., p. 7 of 35)

The Objectants appealed the Former Surrogate's order and judgment to the Appellate Division, Fourth Department, of New York State Supreme Court ("the Fourth Department"). In a decision dated July 8, 2016, the Fourth Department concluded, inter alia, that the Former Surrogate erred in dismissing Trapani's cross-petition based on the Objectants' lack of standing, and found that the Objectants were "interested parties" under Article 81. Further, the Fourth Department found, since Azzi's Article 81 petition did not seek to have the Disclaimer invalidated, the Objectants reasonably expected that the issue of its validity to be resolved in the federal interpleader action—not in the Surrogate's Court proceeding. Given the Objectants' financial interest in the validity of the Disclaimer, the Fourth Department held that the Former Surrogate's failure to provide notice to them before ruling on the Disclaimer's validity deprived the Objectants of notice and an opportunity to be heard. The Fourth Department further found that the Former Surrogate erred in not appointing independent counsel to represent David, and in denying without a hearing the Objectants' motion to disqualify Attorney Laudadio's law firm based on its allegedly impermissible dual representation of David and Azzi. The Fourth Department noted that it was not clear whether the interests of Azzi and David were materially adverse. Finding these errors not

-8-

harmless, the Fourth Department remanded the case to Surrogate's Court for further proceedings.

Upon remand, the Surrogate Calvaruso, and the Honorable John M. Owens ("Surrogate Owens") had taken office on January 1, 2015. Attorney Laudadio and his firm voluntarily withdrew from representing Azzi in the pending Surrogate's Court proceeding. On December 5, 2016, the Judge Owens entered an order appointing the Catholic Family Center ("CFC" or "the Guardian") as David's property guardian. Attorney Laudadio proceeded to represent CFC, in its capacity as Guardian for David. The guardianship appointment apparently was based on David's consent, and the Surrogate Owens did not reach the issues of David's capacity or the validity of the Disclaimer.

## PROCEDURAL STATUS OF THE INTERPLEADER ACTION

The pending summary judgment motion was originally filed by Attorney Laudadio on David's behalf on December 31, 2014 (Dkt #44, with Exhibits). On January 21, 2015, the Objectants filed a response (Dkt #45) in opposition to the motion. On January 27, 2015, Genworth submitted a response (Dkt #46) requesting that it be permitted to deposit the interpleader property into the Court's registry. Attorney Laudadio filed an affidavit in further support of the motion (Dkt #47) on January 27, 2015.

The case was administratively closed on August 31, 2016 (Dkt #53), pending the completion of the Article 81 Proceeding in Surrogate's Court and the appeal taken to the Fourth Department.

On February 22, 2017, the case was restored to the Court's active docket, and the Court issued an order (Dkt #55) directing Genworth to deposit the interpleader property into the Court's registry. The Court directed that any further submissions in regard to David's pending summary judgment motion be filed by March 16, 2017. The Objectants filed a response (Dkt #56, #57). Attorney Laudadio filed an affidavit with exhibits in further support of the motion (Dkt #59). The motion was deemed fully submitted and ready for decision.

However, late in afternoon of March 17, 2017, the Objectants' hand-delivered a package to the District Court Clerk's Office in Rochester. The package contained a letter dated March 16, 2017, from Trapani to the Court. Attached to the letter from Trapani was a duplicate copy of the affidavit filed by the Objectants' attorney, Richard Kaul, Esq. ("Attorney Kaul"), on March 7, 2017. Also included in the package was Michael G. Dwaileebe's amended affidavit with exhibits. Trapani states that Attorney Kaul had requested that they file these documents because he was out of town and could not do so. Trapani continues that due to the severe weather and power outages that affected Rochester last week, the Objectants were unable to correspond with Attorney Kaul, and she

asked that the Court take this factor into account, if there was a question as to the tardiness of their amended response. As set forth in the District's Administrative Procedures Guide, available on the website, "[t]he Court requires attorneys to file documents electronically, absent a showing of good cause[.]" Attorney Kaul has not attempted to show "good cause" or otherwise sought an exception to the restriction against manual filing. In addition, the supplemental submissions are late, and Attorney Kaul did not seek an extension of time in which to file. However, in the interest of completeness, and out of courtesy to the Objectant, the Court has considered the Objectants' late submissions.

For the reasons discussed below, David's motion for summary judgment is granted in its entirety.

## DISCUSSION

## I.   The Appropriateness of Jurisdiction Under 28 U.S.C. § 1335

Genworth asserts that this Court has jurisdiction over this matter under the federal interpleader statute, 28 U.S.C. § 1335 ("Section 1335"). Section 1335 provides in part that "[a] district court[ ] shall have original jurisdiction of any civil action of interpleader . . . filed by any . . . corporation . . . having issued a . . . policy of insurance . . . of $500 or more," if the following conditions are met:

> (1) [t]wo or more adverse claimants, of diverse citizenship as defined in [28 U.S.C. § 1332], are claiming . . . to be entitled to . . . any one or more of the benefits arising by virtue of any . . . policy [of

insurance] . . .; and . . . (2) the plaintiff has . . .
paid the amount of . . . or other value of such
instrument or the amount due under such obligation into
the registry of the court, there to abide the judgment of
the court. . . .

28 U.S.C. § 1335(a). Although Section 1335 references 28 U.S.C.
§ 1332, which "require[s] . . . complete diversity," Purdue Pharma
L.P. v. Kentucky, 704 F.3d 208, 213 (2d Cir. 2013), Section 1335
"has been uniformly construed to require only 'minimal diversity,'
that is, diversity of citizenship between two or more claimants,
without regard to the circumstance that other rival claimants may
be co-citizens[,]" State Farm Fire & Cas. Co. v. Tashire, 386 U.S.
523, 530 (1967) (quotation and footnote omitted).

None of the parties dispute that this Court has jurisdiction.
After independently reviewing the record, the Court finds that
Genworth has satisfied Section 1335's jurisdictional requirements.
The face value of the Annuities at the time of Decedent's death was
$237,986.04 (for the 842 Annuity), and $222,037.47 (for the 864
Annuity). Therefore, the Annuities, individually and in
combination, exceed the required amount-in-controversy. There is at
least minimal diversity among the parties since at least two of the
competing parties are of diverse citizenship.[3] Finally, Genworth
has deposited the proceeds of the Annuities into the Court's

---

[3]

For instance, Linda A. Van Ness is a resident of Georgia; James A.
Dwaileebe is a resident of Massachusetts; and Laurie J. Overmeyer is a resident
of Oregon.

registry, pursuant to this Court's order February 22, 2017 (Dkt #55).

Once the jurisdictional prerequisites of Section 1335 are met, the appropriateness of an interpleader action depends on whether the plaintiff has "'a real and reasonable fear of double liability or vexatious, conflicting claims[,]'" Washington Elec. Co-op, Inc. v. Paterson, Walke & Pratt, P.C., 985 F. 2d 677, 679 (2d Cir. 1993) (quotation omitted), "regardless of the merits of the competing claims." John v. Sotheby's, Inc., 141 F.R.D. 29, 33 (S.D.N.Y. 1992) (citations omitted). The protracted litigation history of this matter, in both Surrogate's Court and this Court, demonstrates that Genworth's fear of double liability is quite real. Therefore, the Court has no difficulty concluding that this interpleader action is appropriate.

## II.  The Summary Judgment Motion

### A.  Rule 56 Standard

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 123-24 (2d Cir. 2014) (quoting FED. R. CIV. P. 56(a)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524

F.3d 160, 163 (2d Cir. 2008). A court deciding a summary judgment motion "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). Nevertheless, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. United States Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).

### B.   Choice of Law

In a federal interpleader action such as this one, where jurisdiction is based on diversity of citizenship, the court applies the choice-of-law rules of the forum state. E.g., Union Cent. Life Ins. Co. v. Berger, No. 10 Civ. 8408(PGG), 2012 WL 4217795, at *8 n. 11 (S.D.N.Y. Sept. 20, 2012) (applying the forum state's choice-of-law rules in an interpleader action under 28 U.S.C. § 1335) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). Here, that state is New York. Although "New York courts will generally enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction," Ergowerx Int'l, LLC v. Maxell Corp. of Am., 18 F. Supp.3d 430, 439 n. 5, 2014 WL 1642970, at *3 n. 5 (S.D.N.Y. Apr. 23, 2014) (internal quotation marks omitted), no party has provided the Court with copies of the Annuities. As a result, the

Court is unable to determine whether the Annuities contain a choice-of-law clause.

Nonetheless, "even when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law." Cargill, Inc. v. Charles Kowsky Res., Inc., 949 F.2d 51, 55 (2d Cir. 1991). Here, David did not cite to any law in his original pleadings in support of his original motion for summary judgment, but instead urged the Court to rely on the prior Surrogate's November 20, 2014 finding that he was incapacitated under M.H.L. Article 81.[4] The Objectants have not cited to any law in their opposition to the summary judgment motion. Courts in this Circuit have held that by not citing to any law, a party thereby indicates its assent to the application of the law of the forum state. See, e.g., Guardian Life Ins. Co. v. Gilmore, 45 F. Supp.3d 310, 323 (S.D.N.Y. 2014) ("[B]y not citing to any law or filing any response to Gilmore's Motion, Gilmore-Smit and Applebee-McPhillips have indicated their assent to the application of the law of the forum state.") (citing Lenard v. Design Studio, 889 F. Supp.2d 518, 528 n. 5 (S.D.N.Y. 2012) (applying the law of the forum state where the plaintiff cited no law in her default judgment submissions and the

---

[4] While Surrogate Calvaruso's finding of incapacity was since vacated by the Fourth Department by virtue of its reversal of his November 20, 2014 order, the Fourth Department did not express any opinion on the correctness of that finding.

defendants did not file any response thereto). The Court therefore will apply New York law to the motion for summary judgment.

### C.   David's Capacity to Execute the Disclaimer

The sole issue in dispute is whether David had the capacity to knowingly and voluntarily disclaim a large portion of his interest in the Annuities, effectively reducing his interest from 100% to 30.25%, with the 69.75% interest he disclaimed to be shared among his siblings.

No party has addressed the burden of proof regarding this issue. "In evaluating mental capacity, New York courts apply two different standards: one for contracts and one for testamentary instruments. The standard for contracts is more exacting than the testamentary standard." Sun Life Assur. Co. of Canada (U.S.) v. Gruber, No. 05 CIV. 10194(NRB), 2007 WL 4457771, at *17 n. 1 (S.D.N.Y. Dec. 14, 2007), aff'd sub nom. Sun Life Assur. Co. of Canada v. Gruber, 334 F. App'x 355 (2d Cir. 2009). In contract cases, New York law "presumes that a person is 'competent at the time of the performance of the challenged action and the burden of proving incompetence rests with the party asserting incapacity.'" Liberty Life Assur. Co. of Bos. v. Bahan, No. 09-CV-4715, 2010 WL 3431147, at *3 (S.D.N.Y. Aug. 23, 2010) (quoting Sears v. First Pioneer Farm Credit, ACA, 850 N.Y.S.2d 219, 222 (3d Dep't 2007)), aff'd, 441 Fed. Appx. 21 (2d Cir. 2011). On the other hand, in probate cases, "[i]t is the indisputable rule in [New York] . . .

that '[t]he proponent has the burden of proving that the testator possessed testamentary capacity[.]'" <u>Estate of Kumstar</u>, 66 N.Y.2d 691, 692 (1985) (second alteration in original; quotation omitted). The Court need not decide whether the Disclaimer is more akin to a contractual agreement or a testamentary disposition. Assuming that the question should be analyzed under contract law principles, the Guardian, as the party asserting David's incapacity, has proven his lack of capacity. Based on that finding, David necessarily would be found incapacitated under the standard applicable to probate cases. See <u>Sun Life Assur. Co. of Canada (U.S.)</u>, 2007 WL 4457771, at *17 ("In this case, we consider only the contractual standard, since if Charles would be deemed capable of designating a beneficiary under the contractual standard, he would necessarily meet the less demanding testamentary standard.").

The starting point for the Court's analysis is M.H.L. Article 81, in particular, § 81.02(b). The Appellate Division, Second Department explained that a determination of incapacity under this section

> must be based upon clear and convincing evidence that the person is likely to suffer harm because he is unable to provide for property management and cannot adequately understand and appreciate the nature and consequences of such inability. The burden of proof is on the petitioner (<u>see</u>, Mental Hygiene Law §§ 81.02[b], 81.12[a]).

<u>Matter of Maher</u>, 207 A.D.2d 133, 139-40, 621 N.Y.S.2d 617, 621 (2d Dep't 1994). In reaching its determination, the court

> must give primary consideration to the functional level
> and functional limitations of the person, including an
> assessment of the person's ability to manage the
> activities of daily living related to property management
> (e.g., mobility, money management, and banking), his
> understanding and appreciation of the nature and
> consequences of any inability to manage these activities,
> his preferences, wishes, and values regarding management
> of these affairs, and the nature and extent of the
> person's property and finances, in the context of his
> ability to manage them (Mental Hygiene Law §§ 81.02[c],
> 81.03[h]).

Matter of Maher, 207 A.D.2d at 139-40.

Here, the evidence submitted on David's behalf is sufficient to prove that David is incapacitated within the meaning of M.H.L. § 81.02(b). In particular, the Court has relied on the detailed report prepared by highly qualified forensic psychologist Dr. Peterson following her evaluation of David in 2013.[5] Dr. Peterson was asked to answer a number of specific questions, described in further detail below, including whether David had functional limitations at the time he executed the Disclaimer which impaired his ability to understand and appreciate the nature and consequences of that transaction. Dr. Peterson conducted extensive personal interviews and testing with David, for a total of 9 hours over three days in July and August of 2013; she also interviewed with Azzi, with David present, for 3 hours over the course of those three days. In addition, Dr. Peterson reviewed a letter from

---

[5]

Dr. Peterson's report (Dkt #59-13) and curriculum vitae (Dkt #59-12) are attached as exhibits to Attorney Laudadio's affidavit (Dkt #59).

David's brother, Gary, and David's records from the Spencerport School District. As far as testing, Dr. Peterson administered the Mini Mental State Examination-Second Edition, Standard Version (MMSE-2: SV); the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV); the Wide Range Achievement Test-Fourth Edition (WRAT-4); the Validity Indicator Protocol (VIP); the Independent Living Scales (ILS) to David. She had Azzi, Mark, and Gary complete the Adaptive Behavior Assessment System, Second Edition (ABAS-11) on David's behalf. Dr. Peterson then issued a 17-page report (Dkt #59-13) detailing her diagnoses, findings, and responses to the specific questions posed to her.

In regards to whether David has functional limitations that impair his ability to provide for his personal needs, Dr. Peterson found that based on the results of the ABAS-11, his personal-care-related functional skills all fell within the "extremely low range (below 98-99% of other individuals his age)." Consequently, Dr. Peterson recommended that a guardian be appointed to assist him with his personal needs, as defined in M.H.L. § 81.03.

Regarding whether David has functional limitations that impair his ability to engage in property management activities, as defined in M.H.L. § 81.03(g),[6] Dr. Peterson stated the results of current

---

[6] "'[P]roperty management' means taking actions to obtain, administer, protect, and dispose of real and personal property, intangible property, business property, benefits, and income and to deal with financial affairs." N.Y. MENTAL HYG. LAW § 81.03(g)

testing "strongly indicate[d]" that his functional limitations "significantly impair his ability to independently engage in property management activities," as defined in M.H.L. Article 81. (Dkt #59-13, p. 16 of 18). In particular, Dr. Peterson noted that David "does not have the vocabulary or reading comprehension skills to read and understand most legal documents, regardless of their purpose[,]" explaining that David's "reading composite score on the WRAT-4 falls at the 1st percentile compared to similar aged peers. That is, 99 percent of people [David]'s age have higher reading skills than him." (Id. (emphasis in original)). Based on her "review of all available information," Dr. Peterson recommended that a guardian be appointed to assist David in making property management decisions, as defined in M.H.L. § 81.03(g).

Dr. Peterson found "clear evidence" that the foregoing functional limitations were present at the time David signed the Disclaimer in March of 2012, noting that school records had classified him with "Educable Mental Retardation," since at least eighth grade. Additionally, there was no reported history of traumatic brain injury or other significant illness post-March 2012 that could have contributed to the functional limitations detected by Dr. Peterson.

As to the effect of his limitations on his susceptibility to undue influence by others, Dr. Peterson first noted that David has been diagnosed with Mild Mental Retardation/Mild Intellectual

Disability. Dr. Peterson quoted the Diagnostic and Statistical Manual-Fifth Edition ("DSM-V"), which states that "gullibility" is "often a feature" of intellectual disability and involves "naïveté in social situations and the tendency for being easily led by others. . . ." (Dkt #59-13, pp. 16-17 of 18). With particular regard to the signing of the Disclaimer, Dr. Peterson opined that it was "likely that the inherent gullibility and lack of awareness of risk" stemming from David's intellectual disability "impair[ed] his ability to understand and appreciate the potential consequences of such a transaction, especially given the magnitude of the decision and given that his brother (i.e., someone he presumably trusted and whom he knew was in charge of dealing with mother's estate) and a lawyer (i.e., someone in a position of authority, someone he trusted and believed was his 'mother's' attorney) were reportedly present at the time."). (Id., p. 17 of 18). In addition, Dr. Peterson found that the testing results "strongly indicate[d]" that David's understanding of money concepts and ability to manage money is "extremely low compared to same aged peers." (Id.). For instance, he was "unable to ascertain his monthly or yearly financial needs or to estimate his monthly or yearly income[.]" (Id.). Consequently, Dr. Peterson opined, it was "unlikely that he could make an informed decision about whether he could 'afford' to agree to any major financial/business transaction or fully appreciate the ramifications of doing so." (Id.). Moreover, David

-21-

"indicated [to Dr. Peterson] that he did not know what the [Disclaimer] forms were for or why he was being asked to sign them at the time (i.e., March 2012)," and just signed them because his brother "said 'sign here.'" (Id.).

Dr. Peterson also was specifically asked whether there was any evidence that David was malingering. She found that he provided valid responses on the VIP, a test designed to identify individuals who are not putting forth full effort on cognitive testing. Moreover, David provided "consistent responses across interview dates." In sum, Dr. Peterson found "no evidence of feigning of cognitive or functional impairments." (Dkt #59-13, p. 18 of 18).

In opposition to Dr. Peterson's well-substantiated, detailed opinion regarding David's incapacity, the Objectants have offered nothing but conclusory assertions about the alleged existence of "factual issues." Michael G. Dwaileebe ("Michael"), one of the Objectants, states that at a "hearing" in this Court, their "attorney expects to call Daniel Schum, Esq. as a witness, as well as others, including professional witnesses, for their opinions as to the capacity of David J. Dwaileebe." (Affidavit of Michael G. Dwaileebe ¶ 17) (Dkt #57). However, there was no suggestion as to the identity of these "other" witnesses. In his supplemental, manually filed affidavit,[7] Michael states that he and his siblings

---

[7] While the Court has considered the Objectants' late-filed, hand-delivered documents, they are not part of the official docket of this case. If Attorney Kaul wishes to make them part of the docket, he must file them electronically

"retained Dr. Jerid Fisher" but they "were denied by the Courts [sic] in April 2014 the opportunity for a second evaluation or rebuttal of Dr. Peterson's report." (Supplemental Affidavit of Michael G. Dwaileebe (not docketed) ¶ 12). Michael apparently is referring to the Surrogate's Court proceeding, and Surrogate Calvaruso's failure to notice the Objectants so that they could appear at the November 2014 hearing. As the Fourth Department found, this was improper, but this error has no bearing on the instant interpleader action and the pending summary judgment motion. The Objectants and Attorney Kaul have been on notice of the contents of Dr. Peterson's report, and Attorney Laudadio's intention to use it to support his request for summary judgment on David's behalf, for several years. Yet the Objectants have never addressed any aspect of Dr. Peterson's report or requested the opportunity to have an expert of their choosing evaluate David's capacity. Instead, Attorney Kaul simply states there are "serious factual issues which come into play, none of which can be resolved upon Motion for Summary Judgment." (Affidavit of Richard Kaul, Esq., ¶ 13 (Dkt #56)). The Court notes that Michael, David's older brother, now raises, at the eleventh hour, an argument contesting Dr. Peterson's report and making a passing mention to a psychological expert, Dr. Fisher, whom the Objectants allegedly retained three years ago. However, there is no indication that this

---

via CM/ECF pursuant to the District's Administrative Procedures Guide for Electronic Filing.

expert has any basis on which to opine regarding David's capacity—he apparently never examined David, much less reviewed any of David's records—including Dr. Peterson's report. In short, the Objectants' proposed expert witness, as well as any opinion he would offer, are purely hypothetical. However, it is settled beyond doubt that "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting Knight v. United States Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)); accord, e.g., Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010). The Objectants, as the nonmoving parties, needed to create more than a "metaphysical possibility" that their allegations are correct; they needed to come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). This they have not done. The Objectants' submissions rest on "speculation" that does not raise more than a "metaphyhsical possibility" of a different conclusion. Accordingly, the Objectants cannot overcome David's well-supported motion for summary judgment.

Based principally on Dr. Peterson's unrebutted and well-supported report, the Court finds that David was incapacitated, as defined in M.H.L. § 81.02(b), when he signed the Disclaimer on March 2, 2012. Put simply, there is no genuine issue of material fact that David has been, and presently is, "unable to provide for

personal needs and/or property management; and . . . cannot adequately understand and appreciate the nature and consequences of such inability." N.Y. MENTAL HYG. LAW § 81.02(b)(1)-(2). Based on this finding of incapacity, it necessarily follows that David did not have the legal ability to enter into a valid contract in March of 2012. Furthermore, one of the consequences of a finding of incapacity under Article 81 of the M.H.L. is that the court that makes such a finding

> may modify, amend, or revoke any previously executed appointment, power, or delegation . . . , or any contract, conveyance, or disposition during lifetime or to take effect upon death, made by the incapacitated person prior to the appointment of the guardian if the court finds that the previously executed appointment, power, delegation, contract, conveyance, or disposition during lifetime or to take effect upon death, was made while the person was incapacitated. . . .

N.Y. MENTAL HYG. LAW § 81.29(d). Therefore, lest there be any doubt, the Court hereby revokes the Disclaimer and declares it to be null and void and of no legal effect whatsoever.

### CONCLUSION

The Motion for Summary Judgment by David J. Dwaileebe (Dkt #44) is granted in its entirety. The Disclaimer and Release signed by David J. Dwaileebe is hereby revoked and declared null and void. Accordingly, as named beneficiary under Individual Single Premium Deferred Annuity Contracts (#431641842 and #431409864) issued by Genworth Life Insurance Company of New York, David J. Dwaileebe is entitled to receipt of 100% of the Death Benefit proceeds payable

under the Annuities, currently on deposit in the Court's Registry. The draft of payment shall be made payable to the Catholic Family Center, as court-appointed Guardian of the Property of David J. Dwaileebe, and delivered to Attorney Laudadio. The Annuities' Death Benefit thereafter will be dispensed for the benefit of David J. Dwaileebe, as provided in Surrogate Owens' decision dated December 5, 2016.

The injunctive relief requested by Genworth in the complaint is granted to the extent that each and every one of the Defendants to this action is restrained from instituting, prosecuting or maintaining, directly or indirectly, any claim or action of any type or kind against Genworth, arising from, or relating in any matter to, the Annuities and the various Defendants' respective claims for payment of some or all of the Annuities' Death Benefit.

**IT IS SO ORDERED**.

S/Michael A. Telesca

_____
HON. MICHAEL A. TELESCA
United States District Judge

DATED:     March 20, 2017
           Rochester, New York